**Charles C. GREINER, Respondent–Appellant,**

**v.**

**Ronald WELLS, Petitioner–Appellee.**

**Docket No. 04–2809–PR.**

United States Court of Appeals, Second Circuit.

Argued: May 4, 2005.

Decided: Aug. 8, 2005.

---

────────

Phyllis Mintz, Assistant District Attorney (Charles J. Hynes, District Attorney for Kings County, New York, on the brief, Leonard Joblove, Assistant District Attorney, of counsel), Brooklyn, New York, for Respondent–Appellant.

Richard Ware Levitt, New York, New York, for Petitioner–Appellee.

Before: WINTER, SOTOMAYOR, and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

This case concerns the proper evaluation of defense counsel's performance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We hold that trial counsel's inability to recall why he abandoned a possible defense strategy—when queried seven years and seven hundred cases after petitioner's trial—does not establish a Sixth Amendment violation where a justification appears on the record.

**I**

Ronald Wells is an inmate in the Green Haven Correctional Facility, incarcerated following his conviction in New York Supreme Court (Kings County) for second degree murder, *see* N.Y. PENAL LAW § 125.25(1), and criminal possession of a weapon in the second degree, *see* N.Y. PENAL LAW § 265.03, for the shooting of Ruben Figueroa. The United States District Court for the Eastern District of New York (Bloom, Magistrate Judge) granted Wells's petition for a writ of habeas corpus on the ground that he was denied effective assistance of counsel when his appointed counsel abandoned at trial a theory that someone else—Richie Roman—committed the crime. A detailed description of the events surrounding Wells's arrest and trial assists in reconstructing the perspective of trial counsel.

**A**

In the early evening of January 31, 1995, two teenagers sat down on lobby steps in an apartment building at 1400 East New York Avenue in Brooklyn. The teens talked and smoked cigarettes while three men drank beer and smoked marijuana in the hallway. One of the teens, fifteen-year-old Ruben Figueroa, lived in the building, and the other, slightly older teen, José Morales, had been friends with him for three years. Another friend, Danny Roman, stopped by to talk for several minutes before continuing on to his apartment to wait for his girlfriend.

Ten minutes later, as Figueroa and Morales remained on the steps, two men entered the lobby. The men approached, and one asked Figueroa, "[W]hat are you doing here? What I told you?" The fifteen-year-old responded, "I'm just chilling." The man then pulled out a gun and shot Figueroa in the chest. Morales tried to help Figueroa escape down the hallway, but one of the men shot Figueroa again, this time in the leg; Figueroa told Morales he could no longer move. The two men fled. Paramedics arrived shortly thereafter but were unable to save Figueroa. They pronounced him dead at 7:04 pm.

Detective Nicholas Tropiano investigated the homicide. Tropiano interviewed Morales, who was unharmed. Morales described the initial shooter as a black male, about 26 years old, weighing about 150 or 160 pounds, and approximately five feet, nine inches tall. On January 31 and again on February 1, Tropiano showed Morales hundreds of photographs, and Morales

could not identify the shooter from any of them. Wells's photograph was not included.

On February 2, 1995, an anonymous caller left the police a tip that Ronald Wells, a black male in his twenties, was the shooter. The following day, Tropiano prepared a six-photograph array including a January 1995 photograph of Wells, and, later that evening, Morales viewed the photos, immediately identifying Wells as "the man that shot my friend." On February 7, Morales picked Ronald Wells out of a six person lineup and again identified him as the shooter. Tropiano placed Wells under arrest and took Wells's pedigree information—Wells reported he was 27, weighed 120 pounds, and stood five feet, seven inches tall.

## B

Just three days later, on February 10, 1995, Wells was assigned Calvin Simons as counsel. Simons had seven years of trial experience with the Legal Aid Society and a year in private practice; in total, he had tried approximately sixty cases. In the month following Simons's assignment, Simons hired a private investigator, David Walker, to aid in Wells's defense.

Simons developed an alibi defense for Wells. Wells's sister stated that Wells and his common law wife were with her from approximately 4:00 pm on January 31 until the following morning. Wells's wife's recollection was similar, although her recall of the timing differed. His wife related that she and Wells left their apartment around 6:00 pm, arrived via subway at his sister's just after 7:00 pm, and remained there until the next morning. In the course of the investigation, Walker informed Simons that Wells knew of another potential alibi witness, a police officer with whom Wells had spoken at a train station the night of

the homicide. Unfortunately, the officer, Walker explained, could not be located.

Simons also received information regarding Wells's and others' motives to kill Figueroa. With regard to Wells, Walker reported a rumor that Wells did the shooting in retaliation for the beating of one of his friends at a nearby building. However, there were also indications that someone else may have been motivated to kill Figueroa, the first indication coming to Simons in a redacted police report dated February 7, 1995. The report detailed a window-shooting incident that occurred just a few days prior to the homicide and involved a conflict between Figueroa's brother José and a person named "Richie." Figueroa, purportedly, was present at the incident. The redacted report read:

> On January 31, 1995 at approximately 2300 hrs., I interviewed {REDACTED} in reference to this incident. She made the following statement. She is the sister of Richie and Danny. She said, that Richie did have a problem with Jose, Ruben's brother. Several months ago, Richie and Jose got into a fight at Blimpie's. Jose slashed Richie with a razor and scarred him over his right eye. About two days ago, Richie saw Jose in front of the building. Richie and Jose got into a fight again. Richie came inside. About twenty minutes later, Jose, Ruben and Pito came to the apartment door looking for Richie. Jose said, that he was going to kill Richie. She opened the door and argued with them for a few minutes. She said, that Jose had a gun. Richie then came to the door and told her to close the door, he didn't want to be bother with them. She then close the door.
>
> She and her family were all inside the apartment when Richie was looking out the window and a shot was fired at the window. Richie said, that Jose had fired

the shot. Her father made a police report. She said, that Richie is presently in Fort Greene with their older brother, {REDACTED}. She said, that her father had taken Richie over there this morning, because he was afraid for him.

Simons received a memorandum from Walker in May confirming pieces of the February 7 report and indicating that the 1400 East New York Avenue tenant most likely to be "Richie" had disappeared. The memorandum explained that two residents of the apartment building had identified a male Hispanic living at 1H as having had disagreements with Figueroa. It also noted that one resident identified a male Hispanic living on the first floor of the building as the person involved in "the window shooting incident." This individual had "disappeared." Walker's report offered Simons the opinion that "[i]n view of the relationship the deceased had with the [male Hispanic] on the first floor, there is a strong possibility that he was the shooter. The fact that this individual has disappeared, gives support to this probability." Walker's memorandum ended with his conclusion that "those persons residing at the location of 1400 East New York Avenue, who have been interviewed to date, are either afraid to divulge any information or are not willing to give up the shooter, for whatever reason."

Simons received more information regarding "Richie" when he received a clean version of the February 7 police report before trial. This unredacted version of the report indicated that the name of the woman interviewed was Valerie Roman and that the name of the older brother with whom "Richie" was staying at that time was Alberto Roman, Jr. The clean report therefore indicated that the "Richie" and "Danny" referenced within the report were likely Valerie Roman's brothers—Richie and Danny Roman.

Using this information, Simons requested that Walker continue his investigation. Simons's specific request targeted Roman family members. In a letter to Walker dated November 30, 1995, Simons noted that, according to a contemporaneous police report, there were shots fired through a window on January 29, 1995, intended for Richie Roman. Simons requested that Walker investigate both the January 31 homicide and the alleged January 29 window-shooting incident. He listed names of potential witnesses and their addresses. His thirteen-person list included Valerie Roman, Richie Roman, Alberto Roman, Jr., Danny Roman, and Alberto Roman, Sr.

A week later, a possible connection between the window-shooting incident and Ronald Wells emerged. On December 7, 1995, Simons attended a pre-trial conference in the Kings County Supreme Court before the Honorable Michael A. Gary. While discussing *Sandoval* issues,[1] the assistant district attorney warned that if Wells testified she would connect Wells to a gang operating out of 1400 East New York Avenue, establish that Wells carried a firearm and had intimidated people at 1400 East New York Avenue, and, significantly, connect Wells with Alberto Roman, Jr. and establish that both were members of the 1400 East New York Avenue gang. The assistant district attorney explained that Alberto Roman, Jr. was friendly with the defendant and that the Roman family had a dispute with Figueroa's older brother and friend "just before this homicide"—

1. "In New York state courts a defendant may request a preliminary hearing, known as a *Sandoval* hearing, to determine whether, if he elects to testify, his prior criminal record may be used to impeach his credibility. *People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974)." *Norde v. Keane,* 294 F.3d 401, 408 n. 1 (2d Cir.2002).

the dispute, presumably, being connected to the window-shooting incident. The assistant district attorney noted the importance of using the gang associations and this connection between the Romans and Wells "to establish a motive." She wanted to develop a record concerning "a rivalry between these two gangs" and to show "that the deceased's brother and friends were at odds with the Roman family and that Alberto Roman is friends with the defendant and [one of the gangs]."

Defense counsel objected, stating that "[f]or the People to bring this out as a possible motive would not really be fair to Mr. Wells and would not be the proper procedure in conducting the trial." Judge Gary agreed in part. He ruled that, without more proof, he would preclude all questioning regarding the gangs. However, the court would permit the prosecution to ask the defendant, if he testified, about the dispute between the Romans and Figueroa, as well as the defendant's friendship with Alberto Roman, Jr. Specifically, the court granted the assistant district attorney's request to ask the defendant, without mentioning gangs, "about his friendship with Alberto Roman and the fact he knew there was an ongoing dispute between the Roman family" and, presumably, Figueroa's brother. Judge Gary stated that the prosecution could pursue this line of inquiry "[d]epending upon what testimony comes out at the trial, what the defendant opens the door to."

After the conference and in response to his previous request for additional investigative assistance—in particular, for further investigation into the Roman family—Simons received a report from Walker dated December 11, 1995.[2] Walker had been unable to interview the Romans. He reported approaching the Roman apartment at 1400 East New York Avenue as well as the separate apartment of Alberto Roman, Jr., and failing to get a response at either home. Walker again concluded, "It is my opinion that if anyone has information, they are either afraid or unwilling to impart it at this time."

## C

Morales was the prosecution's key witness at trial. Simons extensively cross-examined Morales, bringing out Morales's history of criminal activity and drug use and pointing out various seeming inconsistencies in Morales's testimony. In particular, Simons highlighted the apparent discrepancy between Morales's explanation to a grand jury that the three men drinking and smoking in the hallway ran outside before the shooting and his trial testimony that the men did not leave until after the shooter drew a weapon, reminding the jury, "We don't have these three people." Simons also contrasted Morales's report to police that the second man fired the second shot and his trial testimony that he actually did not know who fired that shot. Simons focused on other problems with Morales's story as well. Simons highlighted the difficulties reconciling Morales's claim that he dragged Figueroa down the hallway with the absence of any blood in that area and the discovery of shell casings and bullet fragments only where Figueroa's body was found rather than where he was shot. He also emphasized the discrepancy between Morales's grand jury testimony and trial testimony regarding whether he ran upstairs to notify Figueroa's stepfather about the shooting or whether he took the elevator up to notify Figueroa's mother. Simons pressed his

---

2. The record does not establish when Simons received this report and, in particular, whether or not Simons received the information contained within the report before trial began on December 11 or before the defense presented its case on December 12.

attack on Morales's credibility and testimony alongside a presentation of Wells's alibi defense: Wells's sister and wife both testified that he was with them at the time of the shooting.

Wells did not take the stand and the jury never heard about the window-shooting incident. The prosecution had no opportunity to question Wells about his friendship with Alberto Roman, Jr. and any possible motive stemming from a conflict between Alberto, Jr.'s brother Richie and the victim's brother. Neither side put the Romans on the stand or otherwise introduced testimony regarding the window-shooting incident. Thus, defense counsel did not attempt to shift suspicion to Richie, and the prosecution did not try to demonstrate that Wells's friendship with Alberto, Jr. motivated him to murder Figueroa. Instead, the jury heard a less complicated case—one pitting Morales' identification testimony against the testimony of Wells's alibi witnesses.

On December 13, 1995, the jury found Wells guilty. The court sentenced him to twenty-five years to life on the murder conviction and seven and a half years to life on the weapons charge, with the sentences running concurrently.

**D**

Following the verdict, Wells began the process of challenging the legitimacy of his conviction. Wells pursued several routes of post-conviction relief in the New York courts, repeatedly claiming that Simons's failure to introduce evidence concerning Richie Roman's alleged motive to kill Ruben Figueroa denied Wells effective assis-

tance of counsel. New York courts, at every level, rejected his claim.

**1**

A new attorney, Michael John Meenan, assisted Wells in filing a motion under New York Criminal Procedure Law section 330.30(1) to set aside the verdict due to "defense trial counsel's failure to explore a conflict involving decedent Ruben Figueroa's brother, Jose, and a subject identified in police reports as 'Richie,' whom the defense believes to be one Richie Roman." [3] Meenan argued that, "Significantly, nowhere in the trial record did defense counsel explore a gun conflict between the decedent's brother and Richie *only two days prior to the murder of Ruben Figueroa*—an omission which clearly ignores a plausible alternate theory of motive to kill Ruben Figueroa." Judge Gary, however, found trial counsel's performance exemplary rather than deficient:

> The attorney in this case gave extremely effective cross examination, and was extremely prepared both with legal research and argument. He consistently made every argument in support of defendant, and was a tough and thorough advocate, even calling two alibi witnesses. Defendant cannot complain now that he disagrees with the tactics of defense counsel at the trial because of the unsuccessful outcome.

Judge Gary noted—and rejected without separate discussion—Wells's argument that Simons should have pursued the Richie Roman theory. The court denied Wells's motion.

---

**3.** Section 330.30 provides: "At any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds: 1. Any ground appearing in the record which,

if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." N.Y. Crim. Proc. Law § 330.30.

## 2

Two years later, with Stanley J. Lafazan now serving as counsel, Wells filed a second challenge, this time under New York Criminal Procedure Law section 440.10, to vacate the judgment of conviction or, in the alternative, to hold an evidentiary hearing.[4] This motion, too, was based on the claim that Wells was denied effective assistance of trial counsel because Simons had not introduced evidence regarding the window-shooting incident and had failed to subpoena Richie Roman or the others involved in that incident. Lafazan argued, "It would have been a windfall for the defense to subpoena these witness[es] and have them either take the Fifth Amendment, or, to detail to the jury the decedent's participation in the shooting." Lafazan attached a personal affidavit claiming that Simons had told him "that he did not have a strategy [sic] reason or any other explanation as to why he did not introduce" evidence about the window-shooting incident and that Simons admitted he had "overlooked" it. Wells did not attach affidavits from Valerie Roman and asserted instead that her statements as recorded in a police report were sufficient; nor did he attach affidavits from other witnesses, stating, "any affidavits from these witnesses would have to contain statements against their penal interests." Lafazan did not indicate that he had interviewed the Romans or made any attempt to do so.

The district attorney's office opposed the 440.10 motion on several grounds. Citing New York Criminal Procedure Law section 440.30, which states that motion papers must contain sworn allegations, the prosecution argued that Wells's 440.10 motion should be summarily denied—Wells had not provided sworn information from a reliable source regarding how Valerie Roman would testify regarding the window-shooting incident.[5] The district attorney's office also speculated as to other justifications for Simons's decision not to call Valerie Roman to trial. They argued, first, that if counsel had presented the jury with the theory "that Figueroa had been killed in retaliation for his brother's wrongdoing," the theory "might not have aided in defendant's misidentification defense because it was so transparently speculative that it would have likely been rejected" and "might have deflected the jury from the more appealing alibi defense." Second, they argued that Valerie Roman "would have a strong motive to exculpate her brothers" and could have explained to the jury that her brothers' skin tone was not similar to that described by Morales to Detective Tropiano, even before Morales had identified Wells as the shooter.

Judge Gary denied the 440.10 motion in an order dated September 3, 1998. The court noted that Wells had appealed its denial of his 330.30 motion presenting the same ineffective assistance claim, which the court had rejected, and found that the Appellate Division was "the more appro-

---

4. Section 440.10(1) provides: "At any time after the entry of judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that: ... (h) The judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States." N.Y. Crim. Proc. Law § 440.10(1).

5. Section 440.30(1) provides: "If the motion is based upon the existence or occurrence of facts, the motion papers must contain sworn allegations thereof, whether by the defendant or by another person or persons. Such sworn allegations may be based upon personal knowledge of the affiant or upon information and belief, provided that in the latter event the affiant must state the sources of such information and the grounds of such belief." N.Y. Crim. Proc. Law § 440.30(1).

priate forum for a review of the issue." Judge Gary wrote that, if the 330.30 motion were not pending on appeal, he would deny the 440.10 motion just as he had denied the 330.30 motion.

3

Wells then appealed his conviction and the denial of both motions. On October 25, 1999, the Appellate Division affirmed the conviction and denial of the 330.30 motion, explaining, "To the extent that defendant's motion ... was based on the ground of ineffective assistance of counsel and relied on alleged deficiencies in his counsel's performance which were dehors the record, those claims are not properly before this court on the appeal" and that "[w]ith respect to those aspects of trial counsel's performance which are part of the record[,] we conclude that defendant was not deprived of the effective assistance of counsel." *People v. Wells*, 265 A.D.2d 588, 588, 696 N.Y.S.2d 893 (2d Dep't 1999).

In an opinion filed the same day, the court affirmed Supreme Court's denial of the 440.10 motion. *See People v. Wells*, 265 A.D.2d 589, 696 N.Y.S.2d 893 (2d Dep't 1999). Citing New York Criminal Procedure Law section 440.30(4)(b),[6] the court explained that "the Supreme Court properly denied his motion ... without a hearing since he failed to submit sworn allegations substantiating or tending to substantiate all essential facts necessary to support his claim." *Id.* (internal citations omitted). Wells applied for a writ of error coram nobis to vacate the latter decision on the ground of ineffective assistance of appellate counsel, but the Appellate Division denied the application. *People v.*

*Wells*, 284 A.D.2d 486, 726 N.Y.S.2d 577 (2d Dep't 2001).

4

Wells then applied for leave to appeal to the New York Court of Appeals. His application, drafted by Lafazan, was based in part on the difficulty of securing the cooperation of the Romans in preparing his 440.10 motion. Specifically, he argued that "[t]he burden placed on the defense to obtain a sworn statement from a hostile witness in order to prevail on his 440.10 motion is patently unreasonable." Wells explained that both Valerie Roman and trial counsel, Calvin Simons, had refused to sign affidavits for the defense. Wells presented his case as "an excellent opportunity to clarify the CPL 440.30[4][b] requirement that a defendant submit sworn allegations," and asked, "What if, as here, the witness with knowledge of the essential facts is a hostile witness who refused to submit an affidavit?" On January 20, 2000, the court denied leave. *People v. Wells*, 94 N.Y.2d 886, 705 N.Y.S.2d 19, 726 N.E.2d 496 (2000).

E

This action began on July 2, 2001, when Wells, incarcerated at Green Haven Correctional Facility and proceeding *pro se,* filed a petition under 28 U.S.C. § 2254 for a writ of habeas corpus with the United States District Court for the Eastern District of New York, again raising an ineffective assistance of counsel claim. The district court assigned the case to Magistrate Judge Lois Bloom, and the parties agreed that the assignment would be for all purposes and that any appeal would be directly to this Court. Respondent Charles

---

**6.** Subsection (4)(b) provides that a court may deny a 440.10 motion without conducting a hearing if "[t]he motion is based upon the existence or occurrence of facts and the mov-

ing papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts, as required by subdivision one." N.Y. Crim. Proc. Law § 440.30(4)(b).

Greiner, the Superintendent of the Green Haven facility, raised three defenses in response to the petition. He argued, first, that Wells's claim was procedurally barred because the Appellate Division had affirmed on merely procedural grounds—the lack of sworn allegations; second, that Wells's claim had not been exhausted because he could file a 440.10 motion again in state court; and, third, that the ineffective assistance of counsel claim lacked merit.

### 1

The magistrate judge rejected the first two defenses. Judge Bloom found the procedural bar defense unpersuasive. She cited *Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 809 (2d Cir. 2000), for the proposition that a procedural bar may operate only where the state court's reliance on the bar is "clear from the face of the opinion," *id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)), and reasoned that the Second Department's denial of Wells's ineffective assistance claim was not clearly based on a state procedural ground. Specifically with regard to the 440.10 motion—where the Second Department had affirmed the denial of the motion on the ground that Wells failed to submit sworn allegations tending to substantiate all essential facts necessary to support his claim—the magistrate judge explained, "While it is plausible that the Appellate Division did not consider the merits of petitioner's ineffective assistance claim because his moving papers were not supported by sworn allegations, this is not clear from the face of the court's decision."

Nor did the magistrate judge endorse the Superintendent's exhaustion argument, which proceeded on two theories. The Superintendent argued that Wells had not exhausted his claim because it was not dismissed with prejudice. He then explained that the state court retained discretion under New York Criminal Procedure Law section 440.10(3)(c) to entertain a subsequent 440.10 motion on the same issue. The magistrate judge addressed neither contention. Instead, she proceeded to the merits of Wells's claim.

### 2

Judge Bloom found that an evidentiary hearing would be necessary to resolve the merits. 28 U.S.C. § 2254(e)(2) normally precludes a court from holding an evidentiary hearing for an applicant who "has failed to develop the factual basis of a claim in State court proceedings," unless the stringent conditions of that subsection are met.[7] However, the magistrate judge found that "petitioner was thwarted in his efforts to develop the factual basis of the claim in the state courts." *Wells v. Greiner*, No. 01–cv–4446 (E.D.N.Y. May 13, 2002). Judge Bloom thus ordered a hearing and appointed counsel to conduct the hearing on Wells's behalf pursuant to 18 U.S.C. § 3006A(g) and Rule 8(c) of the Rules Governing Section 2254 Cases.[8] *Id.*

---

7. Subsection (e)(2) provides, "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on—(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

8. Rule 8(c) provides: "If an evidentiary hearing is warranted, the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A."

The court assigned Richard Ware Levitt to the case.

The difficulties encountered by counsel in state court in locating the Roman family members and securing their cooperation repeated themselves with habeas counsel. Levitt explained those difficulties in a letter to Judge Bloom asking the court to order the United States Marshal for the Eastern District of New York to serve subpoenas on Wells's behalf. Those members of the Roman family still living at 1400 East New York Avenue—Valerie, Danny, and Alberto, Sr.—avoided phone calls. And, as soon as Levitt's private investigator made it known that he was attempting to serve a subpoena, he was told that the Romans no longer lived there and that they had neither a forwarding address nor a telephone number. Richie Roman resided at a different address and, even when neighbors told Levitt's investigator that Richie was home, Richie would not answer the door. Levitt asserted that service of the subpoenas would likely only be successful with the Marshal's assistance. The magistrate judge entered an order dated July 17, 2003, ordering the Marshal Service to serve subpoenas on Valerie, Richie, Danny, and Alberto, Sr.

Judge Bloom held the hearing on July 29, 2003. Simons had little recollection of the events surrounding Wells's trial that occurred over seven years earlier—he stated he had handled about 700 cases in the interim—but testified with the help of notes from his files, including memoranda from investigator Walker. Simons could not remember what significance he had attached to the police report memorializing Valerie Roman's account of the window-shooting incident or why he did not try to get its story before the jury: "To be honest with you," he stated, "*I don't remember* specific[ally] today why I either put something in or did not. So my answer would be *I don't remember* why and it's not reflected in any of the notes that I have viewed." [9] He also testified that he *would not have told* Lafazan, Wells's appellate counsel, that he lacked a strategy in not continuing to pursue the incident. Simons testified that Walker made several visits to 1400 East New York Avenue but did not know whether Walker made more than the one documented attempt to interview the Romans. In that attempt, Walker reported hearing people inside who refused to answer. Simons explained that Walker ultimately had no success in interviewing the Romans and that he, Simons, never asked the court for assistance in subpoenaing them.

Richie Roman testified that he lived with his father, sister, and brothers Jacob and Danny at 1400 East New York Avenue in January of 1995 but that he was with his brother Alberto Roman, Jr. playing basketball in Fort Greene at the time of the shooting, his father having sent him to stay with Alberto, Jr. earlier that day for reasons he could not recall. [10] Richie explained that he and Danny were good friends with Figueroa. He testified that he knew Figueroa's brother from the

---

**9.** Wells's counsel also questioned Simons extensively about a post-verdict investigation conducted by Walker on behalf of Simons. Walker's reports indicated that the investigation was into the possible familial link between Figueroa and Morales. Simons had no recollection of the post-verdict investigation and refused to speculate as to the rationale behind the investigation.

**10.** The Romans had various recollections of where Richie was at the time of the murder. Valerie testified that Alberto, Sr., Danny, and Richie were in the apartment with her, Danny testified that Richie went to live with Alberto, Jr. after the shooting, and Alberto, Sr. simply could not remember whether Richie was at home, at his brother's, or at his aunt's.

neighborhood, although not too well, and that he did not know Wells. Upon the advice of court-appointed counsel, Richie invoked the Fifth Amendment and refused to answer Wells's questions regarding the window-shooting incident and the circumstances of Figueroa's homicide.[11]

The other Romans verified certain portions of the February 7 police report. Valerie Roman could not recall the slashing incident but recalled the window-shooting incident and remembered that Figueroa's brother was involved. Danny Roman remembered a fight between Richie and Figueroa's brother, as well as the slashing incident and the window-shooting incident, although he could not recall who fired into the window. Alberto Roman, Sr. recalled Figueroa's brother slashing Richie with a knife and then shooting through the Romans's window.

Neither Wells nor the Superintendent called Alberto Roman, Jr.

### F

After considering post-hearing submissions, the magistrate judge granted Wells's petition. Applying the heightened § 2254(d) review standard created by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, § 104(3), 110 Stat. 1214, 1219, the magistrate judge determined that the Appellate Division's rejection of Wells's Sixth Amendment ineffective assistance of counsel claim was an objectively unreasonable application of *Strickland.*

The magistrate judge announced that Simons's assistance was constitutionally deficient. She cited Simons's failure "to introduce the [February 7 police report]," "to investigate the possibility of an alternate perpetrator," "to interview or call potential exculpatory witnesses," "to complete his investigation of the crime until petitioner had already been convicted," and "to offer any explanation for these omissions." Judge Bloom pointed to a lack of record evidence that Simons had conducted a substantial investigation and stated that "Simons was presented with leads that any reasonably competent lawyer would have pursued." She also faulted Simons for not offering the February 7 police report into evidence and not calling Roman family members to testify.

The magistrate judge rejected the Superintendent's argument that Simons's decision not to call the Romans was sound. The Superintendent had contended that Simons made a tactical decision not to call the Romans to avoid opening the door to linking Wells to Alberto Roman, Jr. and a gang and thus providing the missing motive for the murder. Judge Bloom focused, however, on Simons's testimony that he could not recall the basis of his decision not to call the Romans—emphasizing that "[c]ounsel never stated any tactical reason for his decision"—and concluded, "Respondent's theory for why the [February 7 police report] was not introduced cannot be imputed to petitioner's counsel."

■ The magistrate judge then determined that Simons's failures were prejudi-

---

11. The magistrate judge asked Jeremy Gutman, who was CJA counsel to the court, to be present at the hearing. Gutman conferred with Richie Roman for a few minutes before Richie took the stand. When Wells's counsel asked questions about the window-shooting incident, Gutman told the court, "I am put in a somewhat awkward position because I know so little about this," but that, while "perhaps being overly cautious," he was advising Richie not to answer because of the possibility that his answer would relate "to a potential motive ... that would tend to incriminate him even though it wouldn't in and of itself ... incriminate him in the homicide." Judge Bloom stopped the line of inquiry.

cial because the result of the proceeding would likely have been different if the jury were presented with evidence of Richie Roman's motive to commit the crime. Specifically, she concluded that if Simons had introduced evidence of the window-shooting incident and if "Richie Roman [had] either testified to the dispute or invoked his Fifth Amendment right not to incriminate himself as he did before this Court, there is a reasonable probability that the result of the proceeding would have been different." Finding the state court's conclusions to the contrary "objectively unreasonable," the magistrate judge granted the petition. The Superintendent appeals.[12]

## II

The magistrate judge's decision followed from three determinations: first, that trial counsel's performance was constitutionally deficient, second, that "but for counsel's unprofessional errors, the result of the proceeding would have been different," and, third, that a New York Appellate Division opinion rejecting Wells's Sixth Amendment claim "involved an unreasonable application of[ ] clearly established federal law[ ] as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

The magistrate judge erred in her first determination. Contrary to her conclusion, Simons's conduct fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Wells's ineffective assistance of counsel claim therefore fails. Accordingly, we reverse the magistrate judge's grant of Wells's petition. We need not consider the propriety of the magistrate judge's other conclusions—including her evaluation of *Strickland* prejudice, her application of the heightened AEDPA deference of 28 U.S.C. § 2254(d),[13] her rejection of the Superintendent's procedural bar and exhaustion arguments,[14] and her decision

12. The Superintendent filed a timely but unsigned notice of appeal and an amended, signed notice of appeal thereafter. We have appellate jurisdiction despite the lack of a signature on the initial, timely submission. *See Becker v. Montgomery*, 532 U.S. 757, 760, 121 S.Ct. 1801, 149 L.Ed.2d 983 (2001) ("[I]f the notice is timely filed and adequate in other respects, jurisdiction will vest in the court of appeals, where the case may proceed so long as the appellant promptly supplies the signature once the omission is called to his attention.").

13. Because we hold that Wells's trial counsel was not constitutionally deficient under *Strickland*, we need not decide whether the Appellate Division adjudication of Wells's ineffective assistance of counsel claims was "on the merits" under section 2254(d), rather than on procedural grounds, and, thus, whether AEDPA deference applies. *See generally Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.2003) (explaining that "a federal court should not give AEDPA deference to [a] state appellate court's ruling" where it is impossi-

ble to determine whether the ruling is based on the merits or on a procedural bar); *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir.2001) (" 'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." (quoting 28 U.S.C. § 2254(d))); *see also Smart v. Scully*, 787 F.2d 816, 819–21 (2d Cir.1986) (treating the denial of a section 440.10 motion on the ground of failure to include sworn allegations as a procedural denial, but concluding that such a denial was not based on "adequate and independent state grounds" under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

14. "By reaching the merits of the ineffective assistance claim, we need not determine whether the claim is procedurally barred ...." *Mills v. Scully*, 826 F.2d 1192, 1197 n. 1 (2d Cir.1987). For the same reason, we need not consider the exhaustion issue. *See* 28 U.S.C. § 2254(b)(2) ("An application for a

to grant Wells an evidentiary hearing notwithstanding 28 U.S.C. § 2254(e).[15]

## A

Ineffective assistance of counsel claims appear regularly in habeas corpus petitions. Those claims are grounded, of course, in the Sixth Amendment right of criminal defendants to "the Assistance of Counsel," U.S. CONST. amend. VI, a right which has long been recognized to guarantee "the *effective* assistance of counsel," *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added); *see also Kimmelman v. Morrison*, 477 U.S. 365, 377–78, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (citing Supreme Court cases). That guarantee applies to the States as a component of due process under the Fourteenth Amendment, *see Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Pavel v. Hollins*, 261 F.3d 210, 215–16 (2d Cir.2001), and may be included in a petition for the writ of habeas corpus because "[w]here a State obtains a criminal conviction in a trial in which the accused is deprived of the effective assistance of counsel, the 'State ... unconstitutionally deprives the defendant of his liberty,'" thus rendering the accused " 'in custody in violation of the Constitution,' 28 U.S.C. § 2254(a)." *Kimmelman*, 477 U.S. at 383, 106 S.Ct. 2574 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 343, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

The purpose of the Sixth Amendment effective assistance of counsel guarantee "is not to improve the quality of legal representation, .... [but] simply to ensure that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697, 104 S.Ct. 2052. Rather, "[t]he essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 374, 106 S.Ct. 2574; *see also Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. Effective legal assistance "assures the fairness, and thus the legitimacy, of our adversary pro-

---

writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

**15.** Wells's petition fails even in light of the evidence introduced in the district court, and, therefore, we need not consider whether the district court erred in ordering an evidentiary hearing despite 28 U.S.C. § 2254(e)(2). *See Aeid v. Bennett*, 296 F.3d 58, 64 (2d Cir.2002) ("In these circumstances, where the case may be disposed of on the merits even considering the evidence produced at the disputed evidentiary hearing, we refrain from examining the arguments concerning the propriety of the evidentiary hearing."); *see also Williams v. Taylor*, 529 U.S. 420, 437, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.");

*Boyko v. Parke*, 259 F.3d 781, 789–91 (7th Cir.2001). Nor must we consider the preliminary question of whether the Superintendent should be deemed to have waived any objection to that hearing by not raising the issue on appeal. *See Aeid*, 296 F.3d at 64 (declining, where this Court could dispose of the case on its merits, to address the argument that the respondent had waived any objection to an evidentiary hearing by repeated failures to object to the hearing); *Bryan v. Mullin*, 335 F.3d 1207, 1214 (10th Cir.2003) (declining to address "what steps a respondent must undertake to preserve an objection, predicated on § 2254(e)(2), to a district court decision to grant a habeas petitioner an evidentiary hearing," where the district court had not erred in holding the hearing); *cf. Acosta v. Artuz*, 221 F.3d 117, 121 (2d Cir.2000) (holding that a district court has the power to raise the AEDPA limitations period *sua sponte* because "the defense implicates values beyond the interests of the parties").

cess," *Kimmelman,* 477 U.S. at 374, 106 S.Ct. 2574, by "ensur[ing] that defendants have a fair opportunity to contest the charges against them," *id.* at 393, 106 S.Ct. 2574 (Powell, J., concurring in the judgment).

The familiar test for evaluating an ineffective assistance of counsel claim has two components. The first requires a showing of deficient performance—that counsel's performance "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052; *see Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir.2004). Constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. The performance inquiry examines the reasonableness of trial counsel's actions under "all the circumstances," *id.* at 688, 104 S.Ct. 2052, from the perspective of trial counsel at the time, *Rompilla v. Beard,* 545 U.S. ——, 125 S.Ct. 2456, 2478, 162 L.Ed.2d 360 (2005); *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. As the Supreme Court recently reminded us, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Rompilla,* 125 S.Ct. at 2478 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

In assessing performance, we must apply a "heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a "significant potential downside." *Sacco v. Cooksey,* 214 F.3d 270, 275 (2d Cir.2000); *cf. Bell v. Cone,* 535 U.S. 685, 701–02, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Thus, "[a] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord,* 77 F.3d 578, 588 n. 3 (2d Cir.1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

Prejudice forms the second half of an ineffective assistance claim. There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Cox,* 387 F.3d at 197. The habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir.2004); *see also Rompilla,* 125 S.Ct. at 2471 (Kennedy, J., dissenting).

We limit our inquiry in this case to the performance prong. "[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. We find Simons's performance reasonable under *Strickland.* Specifically, he conducted a reasonable investigation into the Richie Roman lead and made a reasonable decision not to call the Romans to the stand or otherwise to introduce evidence regarding the window-shooting incident. Simons's inability, seven years after the trial, to recall his decision-making process does not change our conclusion.

## B

We begin, as we always begin, with the presumption that counsel was effective. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We then·turn to the challenged conduct—here, Simon's termination of his investigation and failure to put any evidence of the window-shooting incident before the jury—and look for legitimate justifications for that conduct, including justifications transparent on the record and justifications offered by counsel.[16] *See Eze v. Senkowski,* 321 F.3d 110, 136 (2d Cir.2003). For the reasons that follow, we conclude that Simons pursued an objectively reasonable course of action. This conclusion sustains the initial presumption of effective assistance. *Cf. Darden v. Wainwright,* 477 U.S. 168, 186–87, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). But that does not end the matter, for we must also examine counsel's decision-making processes so that if we discover, for instance, that counsel's decisions resulted from incompetence, negligence, or pure

serendipity, we might reconsider any assumption that a "choice" made by counsel was strategic.[17] No evidence establishes that Simons based his decisions on any improper grounds. Wells cannot overcome the presumption of effectiveness; his claim must therefore fail.

## 1

Wells's allegation that Simons's investigation was constitutionally deficient is, at its core, indistinguishable from his allegation that Simons should have presented evidence of the window-shooting incident. The duty to investigate is essential to the adversarial testing process "[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies." *Kimmelman,* 477 U.S. at 384, 106 S.Ct. 2574; *see, e.g., DeLuca,* 77 F.3d at 584–88. The duty requires counsel "to make reasonable investigations or to make a reason-

---

**16.** In *Sparman v. Edwards,* 154 F.3d 51, 52 (2d Cir.1998) (per curiam), we explained that "a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs." We offer defense counsel this opportunity in part because legitimate strategic considerations that may have guided an attorney's conduct are not always "transparent on a cold record." *Eze v. Senkowski,* 321 F.3d 110, 136 (2d Cir.2003).

**17.** *See, e.g., Terry Williams v. Taylor,* 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (concluding, based on evidence that trial counsel incorrectly believed that state law barred access to available records, that counsel's decision not to review those records could not have been strategic); *Pavel,* 261 F.3d at 217–19 & n. 11 (refusing to defer to an attorney's decision not to call a witness where the decision "was animated primarily by a desire to save himself labor" and there-

fore "was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that the federal courts have denominated 'strategic' and have been especially reluctant to disturb"); *Tippins v. Walker,* 77 F.3d 682, 687 (2d Cir.1996) (refusing to extend the *Strickland* presumption of competence where "counsel [wa]s unconscious at critical times" because the Court could not depend on "the buried assumption in our *Strickland* cases ... that counsel is present and conscious to exercise judgment, calculation and instinct, for better or worse"); *DeLuca,* 77 F.3d at 587–90 & n. 3 (finding that counsel performed deficiently by neglecting to pursue a particular defense, even though the decision not to pursue the defense could have been justified, because defense counsel's actual decision "was so hasty and based on so little, that in light of the obvious likely benefits that could be gained from the defense, his decision cannot be considered either a reasonable professional judgment or a reasoned strategic choice").

able decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *see also Terry Williams v. Taylor,* 529 U.S. 362, 395–96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *id.* at 415, 120 S.Ct. 1495 (O'Connor, J., concurring); *Lindstadt v. Keane,* 239 F.3d 191, 200–02 (2d Cir.2001). It does not, however, compel defense counsel to investigate comprehensively every lead or possible defense, *see, e.g., Strickland,* 466 U.S. at 699, 104 S.Ct. 2052; *United States v. Cruz,* 785 F.2d 399, 406 (2d Cir.1986), or "to scour the globe on the off-chance something will turn up," *Rompilla,* 125 S.Ct. at 2463.

The reasonableness of an investigation is obviously a reflection of the facts of a case. Thus, we must make a careful examination of counsel's efforts on a case-by-case basis. *See id.* at 2469 (O'Connor, J., concurring). In some cases, reasonable investigation will require defense counsel to "speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes," *Pavel,* 261 F.3d at 221; *see also Eze,* 321 F.3d at 128, or to obtain those "readily available file[s]" that "the State has and will use against the defendant," *Rompilla,* 125 S.Ct. at 2465. But, as a general matter, when there is "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *cf. Darden,* 477 U.S. at 185–86, 106 S.Ct. 2464.

Norms of practice, reflected in national standards like the American Bar Association (ABA) Standards for Criminal Justice, are useful guides for evaluating reasonableness. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The Supreme Court has frequently cited the ABA Standards in its decisions evaluating the constitutional sufficiency of defense counsels' investigations. *See Rompilla,* 125 S.Ct. at 2466 & n. 6, 2473; *Wiggins v. Smith,* 539 U.S. 510, 522, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Terry Williams,* 529 U.S. at 396, 120 S.Ct. 1495; *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Of relevance here, those standards state that defense counsel should begin a "prompt" investigation.[18] Moreover, a New York practice treatise adds that counsel should enlist the support of an investigator to attempt to locate any witnesses whose names or locations are unknown.[19]

■ But Wells does not argue that his defense counsel failed to initiate a prompt investigation or to hire an investigator to locate witnesses; Simons did both. Instead, Wells contends that Simons should have pursued his investigation into Richie Roman's potential motive further by securing interviews with the Romans or more neighbors. However, in light of Walker's reports that the Romans were unavailable and that persons at 1400 East New York Avenue were "afraid or unwilling" to discuss the case, it is transparent from the record that Simons could have reasonably

---

18. "Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case ...." ABA Standards of Criminal Justice 4–4.1 (3d ed.1993).

19. The treatise suggests that defense counsel always interview available friendly witnesses,

*see* 1–1a New York Criminal Practice § 1a.4[2] (2005), and that "[i]f there are witnesses but the defendant does not know their names or whereabouts an investigator should be hired to locate them, interview them and to try to get them to come to your office or at least to get a written statement from them as to what they witnessed," *id.* § 1a.4[3].

believed that the only way to gain information from these potential witnesses would have been by issuing a subpoena.[20]

The decision to subpoena a witness, however, is a trial-strategy decision, not an investigatory decision. In New York, a subpoena is not an investigative tool for defense counsel; only the State, not the defense, has the power to secure evidence by warrant, *see generally* N.Y. CRIM PRO. LAW, art. 690. Section 610.20(3) of the New York Criminal Procedure Law permits defense counsel to "issue a subpoena . . . for the attendance in such court of any witness whom the defendant is entitled to call," and section 610.10(1) explains that "a person at liberty within the state may be required to attend a criminal court action or proceeding as a witness by . . . subpoena." A subpoena is a means for presenting witnesses to the jury. Therefore, in contending that Simons should have used

his subpoena power, Wells does not fault Simons for failing to discover reasonably available evidence; he does not point to any accessible evidence that Simons failed to discover. He instead argues that Wells should have called certain witnesses to the stand.

In nearly every case that concludes that counsel conducted a constitutionally deficient investigation, the courts point to readily available evidence neglected by counsel.[21] Here, however, Wells's "failure-to-investigate" argument is identical to and no greater than his "failure-to-introduce evidence" argument—that Simons was constitutionally deficient in deciding not to put the Romans on the stand or in not otherwise introducing the window-shooting incident to the jury.[22] It is not a complaint about the scope of Simons's investigation but, rather, a complaint about trial strategy cast in investigatory terms.

**20.** Moreover, to the extent that Wells might argue that Simons should have sent Walker back to 1400 East New York Avenue for additional attempts to contact the Romans or that Simons should have personally contacted the Romans—perhaps by writing—Wells is unable to show any prejudice. The record developed below demonstrates that § 2254 counsel could not secure the cooperation of the Romans without issuing subpoenas; indeed, counsel was unable even to subpoena the Romans without first enlisting the support of the United States Marshal. New York post-conviction counsel encountered similar difficulties, telling the New York Court of Appeals that every "witness with knowledge of the essential facts [wa]s a hostile witness who refused to submit an affidavit." Accordingly, the record does not support a finding that there was a reasonable probability that further attempts at contacting the Romans would have been successful.

**21.** *See, e.g., Rompilla,* 125 S.Ct. at 2465–67 (faulting defense counsel for not consulting a "readily available file" "sitting in the trial courthouse, open for the asking" and emphasizing that "[t]he unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the

trial courthouse"); *Terry Williams,* 529 U.S. at 395, 120 S.Ct. 1495 (faulting counsel for failing to access available records); *Kimmelman,* 477 U.S. at 386–87, 106 S.Ct. 2574 (faulting counsel for failing to request discovery materials from prosecution); *Henry v. Poole,* 409 F.3d 48, 64–65 (2d Cir.2005) (faulting counsel for failing to discover obvious discrepancy in dates); *Eze,* 321 F.3d at 128–30 (faulting counsel for failing to consult available experts and medical literature); *Pavel,* 261 F.3d at 221 (faulting counsel for not interviewing "readily-available fact witnesses"); *Lindstadt,* 239 F.3d at 200 (faulting counsel for not obtaining information "available from a variety of sources"); *Maddox v. Lord,* 818 F.2d 1058, 1061–62 (2d Cir.1987) (faulting counsel for failing to interview an available witness).

**22.** This identity is consistent with Wells's repeated presentation of Simons's ineffectiveness to the State courts. His 330.30 motion complained of defense counsel's failure "in the trial record" to explore the window-shooting incident and his 440.10 motion cited Simon's failure to subpoena the Romans.

**2**

The record provides a legitimate justification for Simons's decision not to introduce evidence regarding the window-shooting incident. In particular, if Simons had chosen to present evidence regarding Richie Roman's conflict with Figueroa, he would have opened the door to the prosecution's introduction of evidence linking Wells and the Romans and the establishment of a motive for Wells to have committed the crime. Counsel was justified in avoiding that scenario.

We are wary of questioning Simons's decision not to subpoena the Romans. Courts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury. "The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) (per curiam). Thus, "counsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir.1997)); *see also United States v. Romero*, 54 F.3d 56, 60 (2d Cir.1995); *cf. Bell*, 535 U.S. at 700, 122 S.Ct. 1843.

■ Our deference is particularly apt where, as here, an attorney decides not to call an unfriendly witness to the stand and has precious little means of determining how the witness might testify.[23] Moreover, insofar as Simons believed that Richie Roman would have refused to testify by invoking a valid privilege—Wells's 440.10 motion contended that Simons overlooked the "windfall" of having the jury witness Richie Roman's invocation of the Fifth Amendment—Simons acted consistently with the norms of practice reflected in the ABA Standards and with well-established New York law in refusing to call him to the stand.[24] The New York Court of Appeals has instructed that it is "wholly improper in most situations to ... allow[ ] a party to parade a witness before the jury for the sole purpose of eliciting in open court the witness' refusal to testify." *People v. Thomas*, 51 N.Y.2d 466, 473, 434 N.Y.S.2d 941, 415 N.E.2d 931 (1980); *see People v. Sapia*, 41 N.Y.2d 160, 163–64, 391 N.Y.S.2d 93, 359 N.E.2d 688 (1976); *cf. United States v. Myerson*, 18 F.3d 153, 158 (2d Cir.1994); *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir.1993).

■ Simons was also justified in keeping the window-shooting incident from the jury in general. Wells is right that Simons could have predicted, from the information he had gathered in his investigation, that, by calling the Romans to the stand or by otherwise introducing the win-

---

**23.** One New York treatise explains that trial counsel "must subpoena a witness who is *vital* to the defense but is unfriendly and refuses to testify," *see* 1–1a NEW YORK CRIMINAL PRACTICE § 1a.10[1][b] (emphasis added), but cautions that "[a]n unfriendly witness should not be called unless *absolutely necessary*," *id.* § 1a.10[1][a] (emphasis added).

**24.** The ABA Standards provide, specifically, that "[d]efense counsel should *not* call a witness in the presence of the jury who the lawyer knows will claim a valid privilege to testify," ABA STANDARDS OF CRIMINAL JUSTICE 4–7.6 (emphasis added), and explain that, although "[s]uch a tactic might be used in order to encourage the jury to draw a negative inference from the fact that the witness is claiming a privilege ..., such conduct is inappropriate" and "unprofessional," *id.*, cmt. *See also* 2A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 407 (3d ed. 2000) ("[I]t is improper to put a witness on the stand merely to have him exercise before the jury his privilege against self-incrimination.").

dow-shooting incident, Simons might have been able to show the jury that Richie Roman had a motive to murder Figueroa.[25] But Simons also knew, from his participation in the December 7 pre-trial conference, that putting the Romans on the stand would allow the prosecution to develop a link between Alberto Roman, Jr. and Wells and thus give the prosecution the opportunity to tie the window-shooting incident to Wells's alleged conduct.[26] Indeed, Simons knew that the "word on the street" was that Wells did the shooting as retaliation for the beating of one of his friends. That rumor was consistent with the prosecution's pre-trial theory that Wells murdered Figueroa in retaliation for assaults on Richie Roman.

We cannot fault Simon for refusing to introduce evidence of the window-shooting incident in light of its "significant potential downside," *Sacco*, 214 F.3d at 275—that it would have opened the door to a prosecution line of inquiry harmful to the defense. *Cf. Darden*, 477 U.S. at 186, 106 S.Ct. 2464; *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052; *Mills v. Scully*, 826 F.2d 1192, 1197 (2d Cir.1987); *Cruz*, 785 F.2d at 406. Establishing Richie Roman's motive would not have excluded Wells from the role of shooter. Moreover, a decision to call the Romans would have risked providing the prosecution an opportunity to convince the jury that Wells murdered Figueroa at their bidding. The prosecution had announced its intention to use the Roman–

**25.** We note, however, that Simons may not have been able to predict that the trial court would have permitted introduction of this evidence. In New York, motive is not an element of murder, *see People v. Caban*, 5 N.Y.3d 143, 2005 WL 1397044, at *5 (June 14, 2005); *People v. Marin*, 65 N.Y.2d 741, 745, 492 N.Y.S.2d 16, 481 N.E.2d 556 (1985), and evidence "[t]hat a third party may have borne animus towards the victim, standing alone, does little to establish that the third party committed the crime," *Wade v. Mantello*, 333 F.3d 51, 60 (2d Cir.2003); *cf. United States v. Diaz*, 176 F.3d 52, 82 (2d Cir.1999). At the time of Wells's trial, New York courts "regularly employed the 'clear link' standard to review trial court determinations that excluded evidence of third-party culpability." *People v. Primo*, 96 N.Y.2d 351, 355–57, 728 N.Y.S.2d 735, 753 N.E.2d 164 (2001) (abandoning the "clear link" phraseology). Under that standard, "evidence of third-party culpability must do more than raise a mere suspicion that another person committed the crime; there *must* be a *clear link* between the third party and the crime in question." *Id.* at 355, 728 N.Y.S.2d 735, 753 N.E.2d 164 (quotation marks and internal citations omitted). *See, e.g., People v. Sparman*, 202 A.D.2d 452, 453, 608 N.Y.S.2d 672 (2d Dep't 1994) (holding, in rape case, that no clear link existed between father of victims and their rapes, even where defense proffered evidence of father's previous conviction for sexual abuse);

*People v. Brown*, 187 A.D.2d 662, 663, 590 N.Y.S.2d 896 (2d Dep't 1992) (holding, in case involving the assault, robbery, and attempted murder of a taxi driver, that no clear link existed between the crimes and an individual accused of similar crimes in the same area and rumored to be the true culprit).

At the district court, the Superintendent argued that the "state court would [not] have permitted defense counsel to call any witness for the purpose of putting evidence of the Romans' motivation before the jury" because "[s]tanding alone, the fact that the Romans bore an animus toward the victim's brother does little to establish that any of the Romans committed the crime" and "[t]he evidence in the record, moreover, indicates that there was no connection between the Romans and the shooting." The Superintendent, however, does not repeat this argument here, and we need not consider the matter as we conclude that not pursuing the Roman–Figueroa connection was a legitimate strategic choice.

**26.** Simons did not know—and could not have known until the Romans were subpoenaed—that each would testify to being unfamiliar with his client. Moreover, at trial that denial might have been juxtaposed with evidence of an affiliation between the Romans and Wells as threatened by the prosecution. Had that occurred, the denial could also have been seen as self-serving and perhaps inculpatory as to Wells and the Romans.

Figueroa conflict and the relationship between Wells and Alberto Roman, Jr. to explain Wells's motive. Simons thwarted that early attempt by the prosecution to explore motive but knew that, if his client testified or the defense somehow opened up the issue of motive, the Wells–Roman connection might be fair game. Thus, if Simons had introduced the Roman–Figueroa conflict, he would have invited the prosecution to inject their eyewitness case with an extra shot of credibility: the State could have added a plausible motive to its prosecution. Simons's decision to avoid the window-shooting evidence limited the State's case to a thin, if ultimately successful, eyewitness prosecution and did not remove his counsel from the "wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

### 3

None of the evidence introduced at the evidentiary hearing relating to Simons's rationales for pursuing his trial strategy—which consisted, mainly, of testimony that he could not *recall* his decision-making processes—can overcome the presumption that Simons rendered effective assistance, a presumption sustained by the transparent logic in avoiding a defense that might actually strengthen the prosecution's case. Wells cannot, therefore, demonstrate constitutionally deficient counsel.

■ Evidence of defense counsel's decision-making processes sometimes demonstrates constitutional deficiency. We have stated that where a habeas petitioner establishes that counsel's choices were not the result of a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client," courts may question such choices. *Pavel,* 261

F.3d at 218. Indeed, courts have found deficient performance where counsel's conduct resulted from an entirely absent investigation, *see, e.g., Kimmelman,* 477 U.S. at 386, 106 S.Ct. 2574; *see also Terry Williams,* 529 U.S. at 395, 120 S.Ct. 1495, a legal error or a misunderstanding of the law, *see, e.g., id.; DeLuca,* 77 F.3d at 587; *United States v. Hansel,* 70 F.3d 6, 8 (2d Cir.1995) (per curiam), a misunderstanding of the case, *see, e.g., Lindstadt,* 239 F.3d at 200, inattention, *Wiggins,* 539 U.S. at 512, 123 S.Ct. 2527, a failure of common sense, *see, e.g., Henry v. Poole,* 409 F.3d 48, 64–65 (2d Cir.2005), or a desire to avoid extra work, *see, e.g., Pavel,* 261 F.3d at 217–18. Thus, evidence of counsel's failure to make conscious, reasonably informed decisions for the benefit of the criminal defendant may at times be sufficient to overcome the presumption of effectiveness.

■ Wells, however, has not presented any such evidence. The *magistrate judge* correctly placed no reliance on the double-hearsay statement in Lafazan's affidavit, attributed to Simons, that Simons had "overlooked" evidence regarding the window-shooting incident.[27] First, the affidavit itself is hearsay evidence—it would be introduced for the purpose of establishing that Simons made that particular communication to Lafazan—and does not fall into a hearsay exception. Specifically, it does not fit into the Federal Rule of Evidence Rule 804(b)(1) exception for admission of the former testimony of an unavailable witness because Lafazan, now deceased, was never subject to cross-examination. *See* Fed.R.Evid. 804(b)(1). Second, Simons's purported statement to Lafazan is hearsay as well and not subject to the Rule 804(b)(3) exception for statements against

---

**27.** We have noted in analogous contexts that the Federal Rules of Evidence govern proceedings under 28 U.S.C. § 2254. *See Bib-* *bins v. Dalsheim,* 21 F.3d 13, 16 (2d Cir.1994) (per curiam) (citing Fed.R.Evid. 1101(e)).

interest because, at the time of the district court's evidentiary hearing, Simons was clearly available to testify—he did testify. *See* Fed.R.Evid. 804(a) (defining unavailability). Wells relies almost entirely, therefore, on Simons's inability to remember his reasons for conducting the trial in the manner that he did. This is insufficient evidence to overcome the presumption of constitutionally effective counsel sustained by the record justification for Simons's actions.[28]

Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the *Strickland* presumption of effective performance. Without evidence establishing that counsel's strategy arose from the vagaries of "ignorance, inattention or ineptitude," *Cox,* 387 F.3d at 201, *Strickland*'s strong presumption must stand. Wells has not shown that his lawyer's performance was deficient; the district court erred by granting Wells's petition.

### Conclusion

For the foregoing reasons, the district court's judgment of April 15, 2004, is hereby **REVERSED**, and the case is remanded with directions to dismiss the petition by entering judgment for respondent.

---

**28.** Wells also relies on a post-verdict investigation into a possible relationship between Morales and Figueroa. That investigation, however, and Simons's inability to recall its purpose, shed no light on Simons's decision not to put the window-shooting incident before the jury.