**UNITED STATES of America**

v.

**Michael MATTHEWS, Petitioner–Defendant.**

**No. 5:05–CR–519.**

United States District Court,
N.D. New York.

Feb. 28, 2014.

Jeffrey R. Parry, Esq., Office of Jeffrey R. Parry, Fayetteville, NY, for Petitioner.

Edward R. Broton, Esq., Richard S. Hartunian, United States Attorney Asst. United States Attorney, Northern District of New York, Syracuse, NY, for United States of America.

## MEMORANDUM—DECISION and ORDER

DAVID N. HURD, United States District Judge.

### I. INTRODUCTION

On September 11, 2006, a jury found petitioner-defendant Michael Matthews ("petitioner" or "Matthews") guilty of conspiracy to commit bank robbery ("Count 1") and committing a bank robbery on September 25, 2003, at a Fleet Bank in Syracuse, New York ("the Syracuse robbery") ("Count 2"). In Count 1, the overt acts alleged to have been committed by Matthews and his co-conspirator(s) in furtherance of the conspiracy included the Syracuse robbery; an October 15, 2003, robbery at a Fleet Bank in Whitesboro, New York ("the Whitesboro robbery"); and a December 11, 2003, robbery at an M & T Bank in Auburn, New York ("the Auburn robbery"). Matthews pleaded

guilty to the Whitesboro and Auburn robberies in state court before the trial began in this case.

On February 21, 2007, petitioner was sentenced to concurrent terms of life imprisonment on each count, pursuant to the three-strikes sentencing law, 18 U.S.C. § 3559(c)(1)(A)(i).[1] The United States Court of Appeals for the Second Circuit affirmed the convictions and sentence on October 7, 2008. *United States v. Matthews,* 545 F.3d 223 (2d Cir.2008) (per curiam). The Second Circuit specifically held that petitioner's prior convictions and his conviction on Counts 1 and 2 in this matter constituted "serious violent felonies" for purposes of the three-strikes law. *Id.* at 228.

Thereafter, Matthews filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. In this motion, he raised an ineffective assistance of counsel claim based on his trial attorney's use of an allegedly biased investigator. This motion was denied in its entirety on July 23, 2009, and petitioner appealed.

On June 14, 2012, the Second Circuit issued a decision vacating the July 23, 2009, Order "to the extent that it summarily rejected Matthews's claim of ineffective assistance of trial counsel due to the alleged conflict of interest of the investigator hired by counsel." *Matthews v. United States,* 682 F.3d 180, 184–85 (2d Cir.2012). In accordance with the Second Circuit's decision and subsequent Mandate, the July 23, 2009, Order was vacated to the extent it denied petitioner's ineffective assistance of counsel claim based on the allegedly biased investigator, Attorney Jeffrey R. Parry was assigned to represent petitioner

in regard to that claim, and an evidentiary hearing was scheduled to determine: (1) was the investigator biased; (2) what evidence an unbiased investigator could have discovered in order to create a reasonable probability that the result of the trial would have been different; and (3) was petitioner's attorney ineffective.

The hearing was conducted on September 10 and 11, 2013, in Utica, New York. At the conclusion of the hearing, the parties were afforded time to review the transcript of the proceeding and submit proposed findings of fact and conclusions of law. Those submissions have been received and reviewed with the transcript. The following are the Findings of Fact and Conclusions of Law required by § 2255(b).

## II. *FINDINGS OF FACT*

The following pertinent facts have been gleaned from documents filed on the docket, the trial transcript and exhibits, and the transcript of and exhibits received at the recent evidentiary hearing.

### A. *The 1982 Arrest*

Richard Haumann was a deputy chief of the Syracuse Police Department in 1982. This position ranked him as the third in command of the department. In September 1982, Matthews and an accomplice robbed a bar in Syracuse at gunpoint. While fleeing the scene, Matthews allegedly fired three shots at a Syracuse police officer. He was arrested and charged with the robbery and attempted murder of the officer. However, prior to trial, he was mistakenly released from custody and remained at large for approximately three

---

1. Matthews had previously been convicted of several serious violent felonies, beginning in 1971 when he was adjudicated a youthful offender following robbery and burglary convictions. In 1983 he was convicted of robbery in New York state court. *See People v.*

*Matthews,* 68 N.Y.2d 118, 506 N.Y.S.2d 149, 497 N.E.2d 287 (1986). He was also convicted of bank robbery and conspiracy to commit bank robbery in federal court in 1993. *See United States v. Matthews,* 20 F.3d 538 (2d Cir.1994).

months. Law enforcement searched for him in what police and local media described as "one of the most extensive manhunts in the city's history." Hr'g Ex. D-30.

While conducting surveillance in the early morning hours of December 26, 1982, Haumann and another officer observed Matthews leave a residence in Syracuse disguised in women's clothing and a wig. Haumann personally tackled and arrested Matthews as he attempted to flee.[2] At the subsequent criminal trial, which took place in October 1983, Haumann testified about his role in the arrest. Matthews was found not guilty of the attempted murder charge.

Deputy Chief Haumann retired from the Syracuse Police Department in 1986. In 1999, he began working as an investigator for the Office of the Federal Public Defender in Syracuse. He will hereinafter be referred to as "Investigator Haumann."

### B. *The 2003 Syracuse Robbery and Trial*

At approximately noon on September 25, 2003, Valerie Sewall[3] and a male accomplice robbed the Fleet Bank on West Seneca Turnpike in Syracuse. Sewall entered the bank first, completed a minor transaction, and left. The male accomplice entered later, completely disguised from head-to-toe, and initiated the robbery. Images from the bank's surveillance cam-

era show Valerie Sewall in the bank at 11:49 a.m. and the male accomplice at 12:10 p.m. The male accomplice could not be positively identified by the images. Eyewitness accounts and subsequent police investigation place his estimated height at five feet, seven inches.

On November 10, 2005, an indictment was filed in the Northern District of New York charging Matthews with one count of bank robbery related to the Syracuse robbery. Assistant Federal Public Defender David G. Secular ("Attorney Secular") appeared on behalf of Matthews on November 21, 2005. A superseding indictment containing Counts 1 and 2 was filed on April 20, 2006. Around this time, Investigator Haumann was assigned to work on Matthews's defense case with Attorney Secular.[4] Federal Public Defender Lisa A. Peebles replaced Attorney Secular as Matthews's counsel on June 30, 2006. Assistant Federal Public Defender James F. Greenwald ("Attorney Greenwald") replaced attorney

Peebles on July 24, 2006. Attorney Greenwald served as Matthews's counsel throughout the trial, which began on September 5, 2006, continued on September 6 and 7, and concluded on September 11, when the jury returned a verdict of guilty on Counts 1 and 2.

At the trial, the Government called John Smith as a witness. He testified that on the morning of the Syracuse robbery, Mat-

---

2. At the September 2013 hearing, Matthews testified that during the arrest, Haumann punched him in the head, slammed his face into the ground, and stated: "Nigger, you don't think we work holidays?" Hr'g Tr., Sept. 10–11, 2013, ECF No. 135, 18:8–10 ("Hr'g Tr.").

3. It is undisputed that Sewall participated in the Syracuse, Auburn, and Whitesboro robberies.

4. At the September 2013 hearing, Matthews described an April 2006 meeting between him

and Attorney Secular. During their meeting, Attorney Secular introduced Haumann as the investigator assigned to Matthews's case. Matthews reports that Haumann stated: "Oh, I know Mike" and made a reference to "gang tackling" him. Hr'g Tr. 29:7, 81:14–19. He further testified that after Haumann left the room, he informed Attorney Secular that Haumann had arrested him in the past for attempted murder of a Syracuse police officer.

thews picked him up at Holloway's garage in Syracuse. He noted that Matthews was driving a white van at the time. They reportedly drove to an auto auction in Cicero, New York, where they purchased a used blue Toyota Corolla sedan. According to Smith, he and Matthews stopped at a gas station to put gasoline in the Toyota, then dropped the blue sedan off at Matthews's apartment on East Kennedy Street in Syracuse. Smith further testified that Matthews then dropped him off back at Holloway's garage between 11:00 a.m. and 11:10 a.m. Matthews then left the area in the white van.

The Government's main witness at the trial was Valerie Sewall, who testified that she and Matthews drove around central New York in late–2002 and early–2003 casing banks. She identified petitioner as her accomplice in the Syracuse, Auburn, and Whitesboro robberies. She specifically claimed that on the morning of the Syracuse robbery Matthews picked her up at her apartment in a white van. She testified that they drove from her apartment on Delhi Street in Syracuse to an apartment building on East Kennedy Street to pick up a second car, a blue sedan. They then drove the two vehicles to a school parking lot near the Fleet Bank on Onondaga Hill, where she reportedly helped petitioner smear black shoe polish on his face and put on a mask, hat, and gloves. She testified that she then drove the blue sedan from the parking lot to the Fleet Bank as Matthews rode in the reclined passenger seat.

Sewall next reported that she entered the bank alone to determine how many employees were working. She completed a minor transaction, exited the bank at approximately 11:50 a.m., and reported back to Matthews in the parked blue sedan. According to Sewall, Matthews then entered the bank and committed the robbery. She claims that he soon exited the bank and she drove them back to the school parking lot, where they abandoned the blue sedan, got back into the white van, and fled. She testified that they drove to an unknown garage on the south side of Syracuse, split up the money, drove to a corner store near her apartment, and then Matthews dropped her off at her apartment on Delhi Street. On cross-examination by Attorney Greenwald, Sewall estimated that approximately twenty-five (25) to thirty-five (35) minutes passed between the time Matthews exited the bank after the robbery and the time she arrived back at her apartment.

Finally, Sewall informed the jury that she and Matthews were apprehended as they fled the Auburn robbery in December 2003. During her direct examination, she identified a letter Matthews had written and given to her after their arrest. This letter contained a version of the events surrounding the Auburn robbery that she was supposed to provide to detectives. This version exonerated Matthews and instead identified a different man as her accomplice. On cross-examination, Sewall acknowledged that she initially lied to the Cayuga County Court about her involvement in the Auburn robbery. She further conceded that she cooperated with the investigating officers to secure her release from jail and to avoid being charged with the Syracuse robbery.

During the defense's case, Attorney Greenwald acknowledged that Matthews committed the Auburn and Whitesboro robberies with Sewall, but argued that he did not commit the Syracuse robbery with her. He argued that Matthews was elsewhere at the time of that robbery. Attorney Greenwald called one alibi witness at trial, Joanne Vaughn. She testified that Matthews had borrowed her white van the night before the Syracuse robbery. She further reported that, on the day of the robbery, he returned the white van to her

office on West Castle Street in Syracuse while she was watching the news on television. A television listing for that day indicated that the news program ran from noon to 12:30 p.m. Vaughn denied seeing any shoe polish on Matthews's face. She further testified that Matthews remained in her office for approximately ten to fifteen minutes, at which time she dropped him off at an unidentified location where his pickup truck was parked.

On cross-examination, Vaughn confirmed that Matthews picked up her white van one evening and returned it the following day, but acknowledged that she was not certain of the exact dates on which this occurred. She also identified a statement she gave to police on October 7, 2003, in which she claimed Matthews had picked up her white van on a Thursday morning and returned it to her home on a Wednesday evening.[5]

During his closing arguments, Attorney Greenwald noted that one-third of the African–American population fit the estimated height of the male accomplice, and suggested that Kenneth Green–Sewall's boyfriend at the time of the Syracuse robbery—was the same height. He also suggested it would be impossible for Matthews to commit the Syracuse robbery, drive around Syracuse thereafter as described by Valerie Sewall, and return the white van to Joanne Vaughn's workplace, without any shoe polish on his face, before the television news program ended at 12:30 p.m. The jury apparently rejected those arguments, and Matthews was convicted.

On November 22, 2006–after the trial but before sentencing—Matthews filed a pro se motion seeking the assignment of new counsel to replace Attorney Green-

wald. In that motion, he alleged ineffective assistance of counsel based, in part, on Attorney Greenwald's use of Investigator Haumann. Attached to this motion was a copy of a newspaper article describing the 1982 arrest. That motion was denied, and he was thereafter sentenced to a term of life imprisonment on both Count 1 and 2.

## C. *The 2013 Hearing*

As noted above, a hearing was conducted in September 2013 to determine what evidence an unbiased investigator could have discovered in order to create a reasonable probability that the result of the trial would have been different. Six witnesses testified.

### 1. *Michael Matthews*

At the hearing, Matthews identified two separate timelines that he had created prior to the trial. He provided the first timeline to Investigator Haumann and Attorney Secular at the earliest stages of his criminal case. *See* Hr'g Ex. D–9. This document outlined his actions and whereabouts on the day of the Syracuse robbery. According to this version of the events, Matthews—driving Joanne Vaughn's white van—picked up John Smith that morning at Holloway's garage in Syracuse and drove to an auction in Cicero, New York. At the auction, they bought a used blue Toyota sedan, filled it up with gasoline at a nearby Byrne Dairy gas station, and proceeded to Valerie Sewall's apartment on Delhi Street, where they left the blue sedan between 10:45 a.m. and 10:50 a.m.

Matthews then stopped at his East Kennedy Street apartment, his Comstock Avenue residence,[6] and then returned to Holloway's garage between 11:35 a.m. and 11:40 a.m. Thereafter, he drove to Joanne

---

**5.** According to the trial testimony, September 24, 2003, was a Wednesday, making the following day—the day of the Syracuse robbery—a Thursday.

**6.** At that time, Matthews's permanent residence was on Comstock Avenue, but he was temporarily living at an apartment on East Kennedy Street due to a restraining order.

Vaughn's workplace on Castle Street, arriving between 11:45 a.m. and 11:50 a.m. He and Vaughn then drove to Vee Harris's house on West Borden Avenue at approximately 12:10 p.m., and then Vaughn dropped Matthews off at his apartment on East Kennedy Street between 12:20 p.m. and 12:30 p.m. Finally, according to this initial timeline, Matthews returned to Holloway's garage between 12:30 p.m. and 12:40 p.m., and then went back to his East Kennedy Street apartment at approximately 12:50 p.m.

The second timeline, which Matthews gave Attorney Greenwald prior to trial, contains a more detailed account of the stops he made on the morning and early afternoon of September 25, 2003. *See* Hr'g Ex. D–23. It contains similar, but not identical, time approximations as the first timeline. According to this account, after dropping the blue Toyota sedan off at Valerie Sewall's apartment and stopping at his East Kennedy Street apartment and Comstock Avenue residence, Matthews returned to Holloway's garage at approximately 11:40 a.m. and briefly spoke with John Smith and dropped off some items. He left Holloway's shortly thereafter and drove to Joanne Vaughn's workplace on Castle Street, arriving between 11:50 a.m. and noon.

Vaughn and Matthews left Castle Street and proceeded to Vee Harris's house to drop off paperwork, arriving between 12:10 p.m. and 12:20 p.m. Vaughn then dropped Matthews off at his East Kennedy Street apartment between 12:20 p.m. and 12:30 p.m. Finally, at approximately 12:30 p.m. John Smith arrived at Matthews's apartment, driving a separate car that Matthews had loaned him earlier in the day. Matthews dropped Smith off at Holloway's garage between 12:40 p.m. and 12:50 p.m. and returned to his apartment.

The Government correctly points out that Matthews's hearing testimony con-

flicts somewhat with the events as detailed in both timelines. For example, he testified that after leaving his Comstock Avenue residence he drove directly to Joanne Vaughn's workplace on Castle Street, and then he and Vaughn stopped briefly at Holloway's garage to drop off some items. This conflicts with the timelines, which suggest he dropped the items at Holloway's and briefly spoke with John Smith before proceeding to Vaughn's workplace. Further, he claimed that when Joanne Vaughn dropped him off at his East Kennedy Street apartment, Cherry Love–Duncan was waiting for him. He reportedly drove Ms. Love–Duncan in his pickup truck to Valerie Sewall's residence to look at the blue Toyota sedan, which Ms. Love–Duncan was interested in buying. However, they left the area after fifteen minutes because neither the blue sedan nor Valerie Sewall was present. This conflicts with the timelines, which indicate Matthews drove John Smith back to Holloway's garage after Joanne Vaughn dropped him off at his apartment. Neither timeline mentions Cherry Love–Duncan.

### 2. *Investigator Richard Haumann*

At the hearing, Investigator Haumann acknowledged being present at the 1982 arrest, but he could not definitively state whether he personally arrested Matthews. He recalled, however, that he spotted Matthews walking down the street wearing women's clothing. He also reported that in his twenty years with the Syracuse Police Department, this was the only time a detainee had been mistakenly released from custody. He acknowledged that this event would have been particularly noteworthy since Matthews was charged with attempting to kill a police officer. In fact, when asked about other notable cases involving the murder or attempted murder of a police officer, he immediately recalled a 1966 case in which two Syracuse police officers had been killed.

Investigator Haumann further testified that when he became involved with Matthews's defense case in 2006, he recalled arresting Matthews on a fugitive warrant in the past. In fact, he and Matthews discussed the fact that Haumann had arrested him once. However, Haumann claims he did not recall the circumstances surrounding that arrest. He reports that he did not recall the specific circumstances of the 1982 arrest until reading a newspaper article after the Second Circuit's decision had been issued in June 2012. He stated that he did not believe the mere fact that he arrested Matthews in the past presented a conflict of interest. The Office of the Federal Public Defender did not provide him with any training regarding conflicts of interest.

Investigator Haumann similarly could not recall whether he alerted Attorneys Secular or Greenwald to the fact that he had previously arrested Matthews. He opined that "[h]ad I known at that time that it involved a police officer, attempted murder of a police officer, I would have told Mr. Greenwald." Hr'g Tr. 139:19–21. Although Investigator Haumann could recall discussing the case with Attorney Greenwald, he was unable to recall the content of those conversations.

According to Investigator Haumann's hearing testimony, his investigation into Matthews's defense included analyzing a 911 recording, performing a time study regarding Matthews's alleged travel around Syracuse after the robbery, speaking with Matthews, and interviewing Joanne Vaughn. He noted that he was not aware of the circumstances surrounding Matthews's alibi defense when he performed the time study. He could not recall seeing the two timelines created by Matthews or even talking to him about his

activities on the day of the robbery. However, an April 4, 2006, memorandum he authored suggests he had a conversation with Matthews about the content of the timelines. See Hr'g Ex. D–8.

### 3. Attorney James Greenwald

According to Attorney Greenwald, Matthews, Investigator Haumann, and Attorney Secular never mentioned the 1982 arrest during the course of his involvement in this case. He reportedly knew that Matthews and Haumann recognized each other from a prior interaction, but he did not inquire into the circumstances of that prior interaction. He claimed that he first learned of the 1982 arrest after the Second Circuit remanded this § 2255 petition in 2012.

In preparation for trial, Attorney Greenwald directed Investigator Haumann to conduct a time study regarding the alleged post-robbery route of travel through Syracuse described by Valerie Sewall. He also personally spoke with Joanne Vaughn and Vee Harris. Further, he learned that while Valerie Sewall and Cherry Love–Duncan were incarcerated together Sewall reportedly told Love–Duncan that "she would do anything and lie to anybody she needed to save her own hide, and she didn't care what happened to Mike." Hr'g Tr. 207:15–17.

Attorney Greenwald and Matthews discussed whether to call Joanne Vaughn, Vee Harris, and/or Cherry Love–Duncan as witnesses at the trial. Ultimately, Joanne Vaughn was the only witness called due to credibility and consistency problems with Vee Harris and Cherry Love–Duncan. They also discussed whether Matthews should testify in his own defense. Matthews deferred to his attorney's recommendation against taking the stand in light of his extensive criminal history.[7]

7. Moreover, the undersigned advised Matthews, in open court during the trial, that it

#### 4. *Attorney David Elkovitch*

Attorney David Elkovitch represented Matthews during the state criminal proceedings stemming from the Auburn robbery. He testified about the numerous misrepresentations made by Valerie Sewall to the Cayuga County Court regarding her involvement in that robbery. She initially denied having any involvement, but later admitted that she was the person who went into the bank in disguise, handed the teller a threatening note, and fled with the money.

#### 5. *Cherry Love–Duncan*

Cherry Love–Duncan testified that, on the day of the Syracuse robbery, she arrived at Matthews's East Kennedy Street apartment after noon. According to her, Matthews and Joanne Vaughn arrived in a white van as she was leaving a note on his pickup truck. She and Matthews then drove in his truck to the north side of Syracuse in an attempt to view a used car he had purchased that morning. However, the car was not there, so Love–Duncan took a bus home shortly thereafter. She testified that she provided this information to Attorney Secular, but was never further contacted by defense counsel.[8]

#### 6. *Gabriel Ramos*

Gabriel Ramos, a private investigator retained by defense counsel for purposes of the September 2013 hearing, performed a time study related to Matthews's alleged travel just before the Syracuse robbery started. Specifically, he drove from Holloway's garage (541 South Avenue) to Valerie Sewall's apartment (204 Delhi Street) to Matthews's apartment (104 Kennedy Street)[9] to the school parking lot near the bank (Onondaga Hill Middle School) and, finally, to the Fleet Bank on Seneca Turnpike. He reported that this route took approximately thirty-eight (38) minutes to complete.

### III. *CONCLUSIONS OF LAW*

As explained at the beginning of the September 2013 hearing, the relevant inquiries are whether Investigator Haumann was biased against Matthews, whether Attorney Greenwald was aware of Investigator Haumann's bias, what evidence an unbiased investigator could have uncovered that Investigator Haumann failed to discover, and whether Attorney Greenwald made a reasonable investigation separate from Investigator Haumann's efforts. The ultimate issue is whether Attorney Greenwald's overall representation fell below an objective standard of reasonableness and, if so, whether such prejudiced Matthews.

was his right to remain silent or testify. Matthews represented that he understood and voluntarily chose not to testify.

**8.** It is unclear whether Love–Duncan spoke with Attorney Secular before the trial in this case. She testified that the conversation could have occurred any time between 2006 and 2008. She also identified a letter she wrote to Attorney Secular and a notarized statement she authored. Hr'g Exs. G–4, G–5. The letter discussed events surrounding the Auburn robbery and is dated December 6, 2006. The statement, dated April 23, 2008, memorializes her version of the events that

occurred on September 25, 2003. Both of these documents were created after Matthews was convicted in this case and therefore could not have been discovered by Investigator Haumann or Attorney Greenwald prior to trial.

**9.** Ramos noted that he drove to 107 West Kennedy Street. It is undisputed that Matthews's apartment was located at 107 East Kennedy Street. Defense counsel claims these locations are equidistant from the cross-street, suggesting the error did not skew the results of the time study.

## A. Ineffective Assistance of Counsel—Legal Standard

■ In order to establish that he was deprived of his Sixth Amendment right to effective assistance of counsel, Matthews must show: (1) Attorney Greenwald's performance was objectively unreasonable and (2) that he was prejudiced by his attorney's sub-standard representation. *Strickland v. Washington*, 466 U.S. 668, 690–92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When considering the first prong, courts are reminded of the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. Further, "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *United States v. Best*, 219 F.3d 192, 201 (2d Cir.2000) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

■ Defense counsel also has a duty to investigate, which "requires [him] 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir.2010) (quoting *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052). This duty "does not, however, compel counsel to conduct a comprehensive investigation of every possible lead or defense, or 'to scour the globe on the off-chance something will turn up.'" *Id.* at 47 (internal citations omitted) (quoting *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)). Instead, "counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* (internal quotation marks omitted).

■ With respect to the second prong of *Strickland*, petitioner must establish a reasonable probability that the outcome of the proceeding would have been different but for his attorney's errors. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *see also* *Brown v. Greene*, 577 F.3d 107, 110 (2d Cir.2009), *cert. denied, Brown v. Rock*, 559 U.S. 1031, 130 S.Ct. 1881, 176 L.Ed.2d 403 (2010). "[A] 'reasonable probability' of a different result is a 'probability sufficient to undermine confidence in the outcome.'" *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir.2009) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

### 1. Investigator Haumann's Conflict of Interest

■ The fact that Investigator Haumann arrested Matthews in 1982 for the attempted murder of an officer under his command unquestionably presents a conflict of interest in relation to his subsequent work on Matthews's defense case in 2006. Regardless of whether then-Deputy Chief Haumann used excessive force and hurled racial slurs at Matthews during the arrest, the very fact that the arrest occurred presents a conflict—especially in light of the nature of the charges, Haumann's position in the Syracuse Police Department at the time, his role in the extensive months-long manhunt and arrest, his participation as a witness in the criminal trial, and the fact that Matthews was acquitted of the attempted murder charge.

Neither Attorney Greenwald nor the Government seriously contend that this history between Haumann and Matthews did not present a potential conflict. At the hearing, Investigator Haumann conceded that had he immediately recalled the specific details of the 1982 arrest when he first began working on Matthews's defense case, such would have amounted to a conflict of interest. *See* Hr'g Tr. 141:3–8. The Government instead invites the Court to simply ignore this conflict because Investigator Haumann did not recall the details of the 1982 arrest until after the trial. That invitation is declined. Indeed, the premise of that argument—that Investiga-

tor Haumann somehow did not remember arresting a man disguised in women's clothing who he believed had fired three shots at a Syracuse police officer and then been inadvertently released back into society, triggering the largest manhunt in the city's history—is completely incredible. When asked whether he arrested anyone else for either murdering or attempting to murder a fellow police officer, Investigator Haumann immediately recalled a 1966 arrest related to the murder of two officers.

Nor is Attorney Greenwald's ignorance of the 1982 arrest excusable. Matthews and Investigator Haumann both testified that they immediately realized Haumann had arrested Matthews in the past. According to Investigator Haumann's hearing testimony, he "thought" he told Attorney Greenwald that he had previously arrested petitioner. Hr'g Tr. 141:23–24. Attorney Greenwald conceded that he knew Matthews and Haumann recognized each other from a prior interaction. His failure to inquire into the circumstances of that prior interaction was objectively unreasonable. Similarly, his assertion that he first learned of the 1982 arrest after the Second Circuit remanded this § 2255 petition in 2012 is not credible. On November 22, 2006—after the conviction but before sentencing—Matthews filed a pro se motion seeking the assignment of new counsel. In this motion, he noted:

> Counsel made no efforts in getting another investigator, for current investigator (Richard Haumann) had conflict of interest with defendant. Defendant was arrested by this investigator when he worked as a detective for the Syracuse Police Dept., for a serious charge against one of his fellow officers. During the arrest, this investigator used a racial slur.

ECF No. 60, ¶ XV. Attached to this motion was a copy of a news article describing the 1982 arrest. *Id.,* Ex. B.

In short, Attorney Greenwald's failure to inquire into the history between Matthews and Haumann, or his conscious decision to utilize Investigator Haumann's services anyway, was unreasonable and tainted the pre-trial investigation.[10]

### 2. *Objectively Unreasonable Investigation*

■ Whether due to bias or simply as a result of indifference or incompetence, the pre-trial investigation performed by Investigator Haumann and Attorney Greenwald was extremely deficient and unreasonable.[11]

■ An attorney's decision to pursue a specific alibi defense, much like the decision to call certain witnesses but not others, is a matter of trial strategy that is generally entitled to deference upon review. *See Greiner v. Wells,* 417 F.3d 305, 319–20 (2d Cir.2005). However, if such strategic choices are made after less than complete investigation, they are only reasonable "to the extent that reasonable pro-

---

10. Attorney Greenwald had other options than Investigator Haumann. At the hearing, he noted that his office has, at times, borrowed an investigator from the Federal Public Defender's Office in Albany or hired an outside investigator.

11. For example, in an August 8, 2006, memorandum related to his time study, Investigator Haumann cited Valerie Sewall's January 28, 2004, statement and noted: "Mr. [sic] Sewall said they left the bank in separate vehicles and drove to the parking lot of the Onondaga Hill Middle School where she says she picked up our client." Hr'g Ex. D–6. This directly conflicts with Valerie Sewall's statement, which indicates that they drove together in the blue sedan from the bank to the school parking lot where the white van was parked. Hr'g Ex. D–42. While this error does not skew the results of the time study, it reflects a general lack of knowledge of the facts of the case.

fessional judgments support the limitations on investigation." *Id.* at 319 (internal quotation marks omitted).

The alibi defense presented by Attorney Greenwald focused only on the alleged actions by Matthews and Sewall *after* the Syracuse robbery. A review of the defense file shows that Investigator Haumann and Attorney Greenwald limited their investigation to the time period occurring after the robbery in an attempt to show Matthews could not have robbed the bank, driven around Syracuse as alleged by Valerie Sewall, and arrived at Joanne Vaughn's workplace before the news program ended at 12:30 p.m. While this is a viable theory of the defense case, there is no reasonable professional judgment to support the decision to limit the investigation to Matthews's post-robbery activity.

In fact, there was a wealth of information in the defense file that should have prompted further investigation into Matthews's location *before* the robbery began. A September 27, 2003, police report, authored by Detective J. Blumer, documents a conversation the detective had with Nathaniel Holloway, the owner of Holloway's garage. *See* Hr'g Ex. D–59. This report indicates that King Williams, who worked at the garage, told Holloway that he saw Matthews at the garage at approximately 11:25 a.m. on the day of the Syracuse robbery. In a September 30, 2003, statement to police, King Williams claimed that he observed Matthews at Holloway's garage at "around 11:30 a.m." Hr'g Ex. D–1. This is reflected in an October 1, 2003, police report, which noted: "Williams stated that a little after 1130 hrs. Matthews came back to the shop again in the van." Hr'g Exs. D–2, D–59.

Further, according to the notes of Detective Blumer, John Smith reported that Matthews returned to Holloway's garage at "11:30 / 11:45." Hr'g Ex. D–4. This account is documented in an October 5, 2003, police report, which reflected: "Smith admitted that around 1130 or 1145 hrs. Michael Matthews did come back to the shop at 521 South Ave." Hr'g Ex. D–44.

These estimates by King Williams and John Smith are entirely consistent with the two timelines prepared by Matthews, who estimated that he arrived back at Holloway's garage between 11:35 a.m. and 11:45 a.m. that day. This information becomes important in light of Valerie Sewall's police statement and her trial testimony. Sewall—the Government's key trial witness—reported that Matthews picked her up at her apartment on Delhi Street and drove to his apartment on East Kennedy Street to pick up the blue Toyota sedan. They proceeded to the school parking lot near the bank on Onondaga Hill, where Matthews changed into a disguise, and, finally, drove to the Fleet Bank on Seneca Turnpike. All of this had to have happened with enough time for Sewall to be caught on camera inside the bank at 11:49 a.m.

However, at the hearing, Gabriel Ramos testified that it took him thirty-eight minutes to traverse the route as described by Valerie Sewall.[12] Thus, it would be impossible for Matthews to be at Holloway's garage at approximately 11:30 a.m., make the stops alleged by Sewall, and be in the parking lot of the Fleet Bank when Sewall is inside the bank at 11:49 a.m.

Despite being in possession of this possibly exculpatory information, neither Investigator Haumann nor Attorney Greenwald ever questioned King Williams or John Smith. Investigator Haumann's notes re-

---

**12.** The fact that Ramos stopped on West Kennedy Street instead of East Kennedy Street is not significant enough to dismiss his entire time study.

flect his understanding that King Williams saw Matthews in the white van "at 11 something." Hr'g Ex. D–8. He never inquired further into the exact time. Nor did Investigator Haumann or Attorney Greenwald conduct a time study to determine whether it is possible to leave Holloway's garage at approximately 11:30 a.m., move about the city as described by Valerie Sewall, and arrive at the Fleet Bank on Seneca Turnpike by 11:49 a.m., only nineteen minutes later.

Attorney Greenwald failed to offer a reasonable justification for the failure to even speak with King Williams or John Smith. At the hearing, he explained that he did not investigate these potentially valuable alibi witnesses because parts of their statements to police were inconsistent with the accounts of other potential witnesses. He acknowledged that he simply relied on the police reports when making this determination and never independently questioned Williams or Smith. Investigator Haumann's excuse for not investigating these leads was simply that Attorney Greenwald had not instructed him to do so. Such poor investigation can only be due to a bias against Matthews or sheer indifference and incompetence. Regardless of the reason, the failure to explore this avenue of an alibi defense was objectively unreasonable.[13]

### 3. *Prejudice*

■ The jury never heard that King Williams told police he saw Michael Matthews at Holloway's garage at approximately 11:30 a.m. on the day of the Syracuse robbery. Nor did the jury learn that John Smith told police he saw Matthews at the garage between 11:30 a.m. and 11:45 a.m. that day. Instead, on Smith's direct examination, the jury was informed that Matthews left Holloway's between 11:00 a.m. and 11:10 a.m., which, if true, left time to be at the bank at 11:49 a.m. During his cross-examination, Attorney Greenwald never challenged Smith on this timeline. Nor did he show the jury that Smith had previously told police he saw Matthews at the garage between 11:30 a.m. and 11:45 a.m., which, if true, left no time to be at the bank at 11:49 a.m.

Presenting the evidence which placed Matthews at Holloway's garage around 11:30 a.m., coupled with a proper time study of the stops he allegedly made after leaving Holloway's, may have led a jury to conclude that he could not have possibly been at the Fleet Bank at 11:49 a.m. to participate in the Syracuse robbery. This evidence, if presented at trial, together

**13.** At the hearing and in his submissions, Matthews also argues that Attorney Greenwald's representation was ineffective due to his failure to interview Cherry Love–Duncan or call her and Vee Harris as witnesses at trial. This argument is unpersuasive. There is no credible evidence to establish that Attorneys Secular or Greenwald could have learned, before trial, of Love–Duncan's claim that she was with Matthews on the afternoon of the Syracuse robbery. The only pertinent information she possessed prior to trial related to Valerie Sewall's propensity to commit perjury when it is in her interest, an issue that was addressed in detail on cross-examination at trial. Similarly, the decision not to call Vee Harris was made by Attorney Greenwald after meeting with her personally, investigating her version of the events and background, and speaking with Matthews. This decision amounts to trial strategy and is therefore entitled to a measure of deference. Finally, to the extent Matthews also claims Attorney Greenwald erred by not investigating the actual height of Valerie Sewall's boyfriend, such is insufficient to establish ineffective assistance of counsel. In his closing argument, Attorney Greenwald specifically suggested that Sewall's boyfriend, Kenneth Green, was the same height as Matthews and could have been the unidentified male accomplice in the Syracuse robbery. He also noted that one-third of the African–American population fit the estimated height.

with the argument that Valerie Sewall may have named Matthews as her accomplice in the Syracuse robbery to protect her boyfriend, may very well have resulted in a different verdict on Count 2. Therefore, the objectively unreasonable investigation and trial examination described above was sufficient to undermine confidence in the outcome of the trial with respect to Count 2.

However, importantly, the ineffective assistance of counsel has absolutely no impact on Matthews's conviction on Count 1, which alleged a conspiracy to commit the Syracuse, Whitesboro, and Auburn robberies. All of the aforementioned evidence that an unbiased, competent investigator and defense attorney could have uncovered and presented to the jury relates to the Syracuse robbery only. Matthews pleaded guilty to the Whitesboro and Auburn robberies in state court prior to the trial in this federal case. Further, Valerie Sewall testified that she and Matthews drove around central New York casing banks in late–2002 and early–2003. She also identified petitioner as her accomplice in the Whitesboro and Auburn robberies, and the duo was apprehended as they fled the Auburn robbery. Moreover, Sewall identified a letter Matthews gave her which outlined a fictional version of the Auburn robbery in an attempt to cover-up the conspiracy after their arrest. All of this evidence and testimony was presented to the jury.

Even if Attorney Greenwald presented a sufficient alibi defense to negate the Government's case against Matthews with respect to the Syracuse robbery, there was more than sufficient evidence to establish an agreement between Matthews and Sewall to commit the Whitesboro and Auburn robberies as alleged in Count 1 of the superseding indictment. Therefore, his conviction on Count 1 stands independent of the ineffective assistance of counsel

claim. *See United States v. Coplan*, 703 F.3d 46, 63 (2d Cir.2012) ("[T]he lack of sufficient evidence to support one of the objects of a multi-object conspiracy will not vitiate the conspiracy conviction, where there is sufficient evidence to support another object." (internal quotation marks and alterations omitted)), *cert. denied*, —— U.S. ——, 134 S.Ct. 71, 187 L.Ed.2d 29 (2013). In short, no amount of ineffective assistance of counsel regarding the circumstances of the Syracuse robbery could have possibly caused a different outcome on Count 1. Matthews does not argue otherwise.

Accordingly, Matthews's motion to vacate, set aside, or correct his sentence pursuant to § 2255 will be granted only with respect to Count 2.

## B. *Remedy*

■ Where a court vacates and sets aside a judgment pursuant to § 2255, it shall also "discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). As explained above, the ineffective assistance of counsel only prejudiced Matthews on Count 2. His conviction for conspiracy in Count 1 remains. In its June 14, 2012, Order, the Second Circuit noted:

Section 3559(c) provides, in pertinent part, that if a person "convicted in a court of the United States of a serious violent felony" has previously "been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of ... 2 or more serious violent felonies," that person, "[n]otwithstanding any other provision of law, ... shall be sentenced to life imprisonment." 18 U.S.C. § 3559(c)(1)(A)(i). For purposes of this section, " 'serious violent felony' " is defined to include "robbery (as de-

scribed in section 2111, 2113, or 2118)" and "conspiracy ... to commit any of the above offenses." *Id.* § 3559(c)(2)(F)(i).

*Matthews,* 682 F.3d at 182. Therefore, Matthews's conviction on Count 1 for conspiracy to commit robbery, which remains untouched by the above decision, triggers a mandatory life sentence in light of his multiple prior convictions. *See United States v. Snype,* 441 F.3d 119, 144 (2d Cir.2006) ("Because the jury in this case found Snype guilty beyond a reasonable doubt of conspiring to commit robbery in violation of § 2113, his instant crime plainly falls within the definition of serious violent felony....").

In sum, petitioner Michael Matthews is entitled to have his conviction and sentence on Count 2 set aside. However, his conviction and sentence on Count 1 remains in full force and effect. Thus, his life sentence is unaltered. Indeed, he was sentenced to a term of life imprisonment "on each count to be served concurrently with each other." J. at 2.

## IV. *CONCLUSION*

The pre-trial investigation into Matthews's potential alibi for the Syracuse robbery was unquestionably tainted by bias and/or incompetence. It was woefully inadequate and objectively unreasonable. An unbiased and competent investigator and defense counsel could have uncovered relevant exculpatory evidence, which was readily available in the defense file. Had such evidence been presented to the jury, it is reasonably probable that the outcome of the trial would have been different with respect to Count 2. Therefore, Attorney Greenwald's overall performance amounted to ineffective assistance of counsel.

However, the ineffective assistance only impacts Count 2. Indeed, all of the evidence identified at the evidentiary hearing relates to the Syracuse robbery only.

There was more than enough reliable direct evidence presented at trial to establish an agreement between Matthews and Valerie Sewall to plan and commit the Whitesboro and Auburn robberies. Thus, this decision has no effect upon Matthews's conviction for the conspiracy outlined in Count 1 of the superseding indictment. As he was sentenced to concurrent life sentences on both Counts 1 and 2, this decision has little practical consequence and he will remain in prison for life.

Therefore, it is

ORDERED that

1. Petitioner Michael Matthews's motion to vacate, set aside, or correct his sentence pursuant to § 2255 is GRANTED in part;

2. The conviction and sentence as to Count 1 of the superseding indictment remains in full force and effect; and

3. The conviction and sentence as to Count 2 of the superseding indictment is VACATED.

IT IS SO ORDERED.